FILED

2013 Dec-19  AM 10:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

NADINE F. BISHOP,              )
                              )
          Plaintiff,          )
                              )
     v.                       )     CIVIL ACTION NO. 2:11-CV-3438-VEH
                              )
CAROLYN W. COLVIN,            )
Commissioner of Social Security, )
                              )
          Defendant.          )

## MEMORANDUM OPINION

The plaintiff, Nadine F. Bishop, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for disability insurance benefits and Supplemental Security Income. The plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

## I. STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were

applied. <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." <u>Id.</u> (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Id.</u> This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990). Even if the court finds that the evidence preponderates against the Commissioner's decision, the court must affirm the Commissioner's decision if it is supported by substantial evidence. <u>Ellison v. Barnhart</u>, 355 F.3d 1272, 1275 (11th Cir. 2003).

## II. STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish entitlement for a period of disability, a claimant must be disabled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I). For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

2

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520 (a)-(f). The Commissioner must determine in sequence:

(1)   whether the claimant is currently employed;

(2)   whether she has a severe impairment;

(3)   whether her impairment meets or equals one listed by the Secretary;

(4)   whether the claimant can perform her past work; and

(5)   whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." Pope, 988 F.2d at 477; accord Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

In the present case, the ALJ determined the plaintiff met the first two tests, but concluded she did not suffer from a listed impairment. The ALJ found the plaintiff had the residual functional capacity (RFC) "as set forth in Exhibits 7F and 8F, except the claimant must have a sit/stand option and the claimant experiences mild to moderate pain." R. 24. Exhibit 7F was the physical RFC assessment completed by the State agency non-medical disability examiner. R. 234-241. Exhibit 8F was the mental RFC assessment completed by

Dr. Estock, M.D., the State agency psychiatric consultant. R. 242-245. Based on the plaintiff's RFC, the ALJ found the plaintiff could not perform any of her past relevant work. R. 28.

Once it is determined the plaintiff cannot return to her prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do." Foote, 67 F.3d at 1559. When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids). Foote, 67 F.3d at 1558-59. The presence of a non-exertional impairment (such as pain, fatigue, or mental illness) also prevents exclusive reliance on the grids. Foote, 67 F.3d at 1559. In such cases, "the [Commissioner] must seek expert vocational testimony ." Id. The ALJ found the plaintiff would be able to perform other jobs in the national economy based on the testimony of a vocational expert (VE). R. 29. Therefore, he found the plaintiff was not disabled at step five of the sequential evaluation framework. R. 29.

### III. FACTUAL BACKGROUND

The plaintiff filed applications for a period of disability, disability insurance benefits, and Supplemental Security Income (SSI) on October 16, 2007. R. 63-64. She alleges she became disabled on October 16, 2007. R. 40. The plaintiff was 53 years old at the time of the ALJ's decision. R. 41. She has a high school education, plus a two-year associate's degree, and past relevant work as an adjustment clerk/processor. R. 42, 56, 139, 165. She alleged she was disabled due to lower back and right leg problems; fibromyalgia; degenerative disc disease in her upper back; a herniated disc in her middle back; and depression. R. 160.

4

Treatment records show the plaintiff was seen by Dr. Foster on April 29, 2008, with complaints of right hip pain and problems sleeping. R. 291. Examination showed edema in the lower extremities and clicking in the right hip. R. 291. Dr. Foster diagnosed the plaintiff with arthritis. R. 291.

On September 30, 2008, the plaintiff saw Dr. Foster complaining of wheezing for the past three weeks. R. 290. She continued to carry a diagnosis of hip pain and weakness. R. 290. An MRI of the plaintiff's hips was ordered. R. 290. The MRI showed no evidence of fracture or dislocation of the hips, and there was no evidence to suggest the presence of bursitis. R. 263. The impression was: "Unremarkable MRI of the hips." R. 263.

When the plaintiff saw Dr. Foster on November 19, 2008, she continued to report right hip pain. R. 289. Dr. Foster noted the plaintiff's MRI was normal, but found tenderness in the left hip on physical examination. R. 289.

The plaintiff was seen at Dr. Foster's office on April 22, 2009, complaining of swelling all over her body after she started taking Nexium. R. 284. Dr. Foster assessed the plaintiff with edemal fibromyalgia. R. 283.

When she was seen at Dr. Foster's office on November 17, 2009, the plaintiff complained of extreme fatigue, weakness, and trouble getting up in the morning. R. 282. She also complained of back pain, joint pain, stiffness, myalgias, and depression. R. 281-82. Dr. Foster indicated the plaintiff's musculoskeletal examination was normal. R. 281. She was given samples of Savella for her depression and fibromyalgia. R. 281.

On December 17, 2009, the plaintiff was seen at Dr. Foster's office reporting she had not noticed much difference after taking Savella for two weeks. R. 280. The plaintiff had a flat affect. R. 279. The plaintiff continued to be diagnosed with fibromyalgia. R. 279. The possible need for a rheumatology referral was noted and she was to continue Savella. R. 279.

On January 14, 2010, the plaintiff was seen at Dr. Foster's office with nausea, possibly related to sinus drainage. R. 278. She reported Savella was causing nightmares, and that she was no longer seeing her psychiatrist, Dr. Jetty, because it was too expensive. R. 278. The treatment note states the plaintiff would be referred to a specialist for assessment of her fibromyalgia. R. 277.

On February 16, 2010, the plaintiff saw Dr. Morgan, a rheumatologist, to whom she had been referred by Dr. Foster. Dr. Morgan noted the plaintiff "understands that she has osteoarthritis and fibromyalgia and has a quite suboptimal status." R. 301. She reported that her symptoms started after a fall on her right hip in 2007. R. 301. Dr. Morgan noted it was not clear whether there was a fracture, or if a dislocation required screw fixation. R. 301. Dr. Morgan noted the plaintiff also has had discomfort in her knees and arms. R. 301. The plaintiff told Dr. Morgan she had previously been referred to Dr. Fagan, a neurologist, for nerve conduction studies, which did not show abnormalities. R. 301. She also reported she had been referred to Dr. Oh, of UAB Neurology, "and got a fibromyalgia designation." R. 301. Dr. Morgan noted "[i]t appears this was also diagnosed before then." R. 301.

Dr. Morgan found the plaintiff had a "depressed mood with very good cooperation" during the examination. R. 302. The plaintiff's neurologic examination was normal. R. 302. Dr. Morgan observed: "The large and small joints do not appear unremarkable [sic]. There is not particular soft tissue tenderness and typical fibromyalgia trigger point areas do not appear remarkable." R. 302. Dr. Morgan deferred his diagnosis. R. 302. The treatment plan contains the following:

> We suspect there is a combination of pain causes including myofascial aspects but also associated with clinical depression and localized osteoarthritis aspects. This includes lumbar spine and hip. We think she is getting effect from the current treatment and perhaps most likely there is not a lot of additional benefit likely from medications.

R. 302-03. Dr. Morgan discussed other modes of treatment, "including trying to get enjoyment from social, religious and service parts of life." R. 303.

After this visit, Dr. Morgan wrote a letter to Dr. Foster, which included the following: "My impression is deferred as to final impression. We however think that she has the combination of pain of fibromyalgia, dysthymic and osteoarthritis aspects." R. 304.

The plaintiff followed up with Dr. Morgan on March 16, 2010. She reported she did not feel better than on the previous visit. R. 306. She reported she was "hurting all over, including in the legs, arms and knees." R. 306. Dr. Morgan noted the plaintiff's laboratory results were surprising, "with the elevation of cyclic citrullinated peptides in the strong positive range." R. 306. However, the plaintiff's rheumatoid factor and direct ANA were not abnormal. R. 306. She also had a mildly elevated C-reactive protein. R. 306. Dr. Morgan

7

found no change in his physical examination of the plaintiff as compared to the previous visit. R. 306. However, he was concerned about her "unsatisfactory symptomatic status." R. 306. Dr. Morgan found the plaintiff had "bony and soft tissue involvement at most of the DIP joints [distal interphalangeal joints of the hand], but did not have "as much if any proximal interphalangeal joint thickening." R. 306. Dr. Morgan noted an elevated level of cyclic citrullinated peptides (CCP) was "indicative of rheumatoid arthritis presence or subsequent development." R. 306. Dr. Morgan's note states as follows: "We do not think that there are enough features now to make that designation but do keep that possibility in mind." R. 306. Dr. Morgan's clinical impression was atypical osteoarthritis, possible; and positive CCP. R. 306. The plaintiff was to stop Celebrex and to try prednisone 10 mg per day. R. 306. She was to be reassessed in one month's time. However, there are no further treatment notes from Dr. Morgan in the record.

On March 17, 2010, the plaintiff was seen by Dr. Foster, and reported she had seen Dr. Morgan. R. 288. The plaintiff complained of back/neck pain, joint pain, and stiffness. R. 288. Dr. Foster's musculoskeletal examination found the plaintiff was tender in all joints and all trigger points. R. 287.

On April 13, 2010, Dr. Foster completed a physical capacities evaluation ("PCE"), indicating the plaintiff would be limited to lifting five pounds occasionally or less. R. 316. The plaintiff was limited to a total of two hours sitting in an eight-hour day. R. 316. She was limited to a total of one hour of combined standing and walking in an eight-hour day. R. 316.

Dr. Foster also completed a clinical assessment of pain form indicating that "[p]ain is present to such an extent as to be distracting to adequate performance of daily activities or work." R. 317. Dr. Foster indicated the plaintiff's pain would be greatly increased by physical activity, and drug side effects could be expected to be severe. R. 317-18. Dr. Foster indicated the plaintiff has an underlying medical condition consistent with the pain she experiences. R. 318. She also indicated fatigue/weakness would be present to such an extent as to negatively affect adequate performance of daily activities or work. R. 319. Dr. Foster opined that physical activity would increase the plaintiff's fatigue/weakness to such an extent as to require bed rest and/or medications. R. 319. She indicated the plaintiff had an underlying medical condition consistent with the fatigue/weakness she experienced. R. 320.

The plaintiff also suffers from mental impairments. Dr. Foster referred the plaintiff to Dr. Jetty, a psychiatrist. R. 255. On May 21 2007, Dr. Jetty noted the plaintiff had a 10 month history of depression. R. 255. The plaintiff reported she could not work because it was a struggle just to deal with everyday life. R. 255. She reported crying spells. R. 256. The plaintiff's sister, who accompanied her to the appointment, reported these crying spells lasted several hours per day. R. 256. It was also reported the plaintiff "rambles incoherently," and does not or cannot clarify what she said. R. 256. During the mental status examination Dr. Jetty found the plaintiff was depressed and tearful. R. 257.

On her June 7, 2007, visit to Dr. Jetty, the plaintiff reported feeling shaky, but overall better. R. 254. The treatment note indicates the plaintiff had been diagnosed with Major

Depressive Disorder, Recurrent, Severe With Psychotic Features. R. 254. The plaintiff reported she had experienced no crying spells. R. 254. The plaintiff's family rated her improvement at 75 percent, and the plaintiff reported an 85 percent improvement. R. 254.

On June 25, 2007, the plaintiff reported no crying episodes. R. 253. She reported that she continued to ramble while talking, and had difficulty focusing and concentrating. R. 253. She reported that she had started cooking again, and her personal care was improving. R. 253. The treatment note indicates that "physically/mentally she feels unable to cope." R. 253. Dr. Jetty noted the plaintiff reported she was babysitting three of her godson's children. R. 253. The plaintiff reported that she "[h]as applied for food stamps. They have asked her to enroll in a job training program." R. 253. Dr. Jetty opined the plaintiff might benefit from vocational rehabilitation. R 253.

On August 7, 2007, the plaintiff reported to Dr. Jetty things were "going okay," although she was still depressed. R. 252. Dr. Jetty encouraged the plaintiff to apply for jobs, which would increase "her activity level, social interaction [and] boost her self-esteem which had been low." R. 252.

On October 9, 2007, the plaintiff told  Dr. Jetty she was somewhat better. R. 251. However, she reported that she had difficulty waking up in the morning, and usually went back to sleep because she had nothing to do. R. 251. At this visit, she reported an episode in which she heard someone opening the door and running in her house. R. 251. But when she got up and looked, no one was there. R. 251. She reported that she had experienced a couple

of similar episodes, but not on a regular basis. R. 251. The plaintiff also reported she had

signed up for vocational rehabilitation. R. 251

The first note from Dr. Jetty after the plaintiff's alleged onset date was on November

8, 2007. The plaintiff reported she had attended vocational rehabilitation. R. 250. She denied

having either paranoia or hallucinations. R. 250. Dr. Jetty reported the plaintiff continued to

battle depression, which the plaintiff rated as an eight. R. 250. The plaintiff reported she was

going to church, keeping her grandchildren, and walking around the mall. R. 250.

On January 25, 2008, the plaintiff told Dr. Jetty she was feeling better on Lexapro, but

complained it was making her too drowsy. R. 249. The plaintiff rated her depression as a six.

R. 249. Although she reported no paranoia, she did have perceptual problems. R. 249. She

reported she felt something was under the covers on two occasions, but when she checked

nothing was there. R. 249. Dr. Jetty reported the plaintiff's affect was more reactive, and that

she was babysitting her nine-month-old granddaughter on the weekends. R. 249. Topamax

was prescribed to help reduce the plaintiff's bad dreams.

On August 6, 2008, the plaintiff told Dr. Jetty she was doing fair. R. 248. She reported

the Topamax had helped, but still complained of bad dreams. R. 248. She reported the

increased dosage of Lexapro helped her depression, and that she was spending more time

with her family. R. 248. She had also gone shopping with her sister, which she had not done

in a long while. R. 248. The plaintiff rated her depression as a five. R. 248. Dr. Jetty noted

the plaintiff's affect was restricted, but that she did "lighten up several times during the

interview." R. 248. Dr. Jetty noted the plaintiff's paranoia was better. R. 248. The plaintiff's medications were adjusted and she was to follow-up in two months. R. 248.

When the plaintiff saw Dr. Jetty on January 8, 2009, it was noted she missed her October appointment. R. 247. The plaintiff reported she was taking computer classes. R. 247. Dr. Jetty noted the plaintiff laughed when she stated she was "trying to put some knowledge in this old brain." R. 247. The plaintiff reported ongoing problems with bad dreams. R. 247. She rated her depression as 7.5 or 8 following her mother's death the previous August. R. 247. The plaintiff denied paranoia and reported no clear hallucinations. R. 247. This is the final treatment note from Dr. Jetty in the record.

The plaintiff was referred to Dr. Gordon for a consultative psychological evaluation by the Social Security Administration on February 21, 2008. R. 214-17. Dr. Gordon did not have access to the plaintiff's treatment records when she conducted her evaluation. R. 214. The plaintiff reported she had depression, anxiety, and panic attacks. R. 214. She reported visual hallucinations involving "movement of people down the hall and under the covers." R. 214 She also admitted she occasionally "rambles and speaks in tongues at night." R. 214. The plaintiff reported having horrible dreams and at least one panic attack per month. R. 214. She reported difficulty concentrating and impaired memory functioning. R. 214.

On mental status examination Dr. Gordon noted the plaintiff was "pleasant, polite, and socially appropriate at all times." R. 215. Rapport was good and she was able to initiate and maintain interactions with Dr. Gordon. R. 215. Dr. Gordon reported the plaintiff's mood

appeared to be dysthymic, and that her affect was sad and consistent with her mood. R. 215.

Dr. Gordon reported the plaintiff's memory appeared intact for recent and remote

information. R. 216.

Dr. Gordon made the following diagnoses on Axis I:  Major Depressive Disorder,

Single Episode, Severe, With Psychotic Features; Anxiety Disorder NOS; Panic Disorder

Without Agoraphobia; Pain Disorder Associated With Both Psychological Factors and a

General Medical condition; and Hypersomnia Related to Depression. R. 216. Dr. Gordon

gave the plaintiff a GAF score of 50.[1] Dr. Gordon opined that, based on the results of her

evaluation, the plaintiff

> should be able to learn, remember, and follow-through on work instructions.
> However, her work focus and subsequent work pace are likely to fall below
> average at all times due to psychological issues and mental and physical
> fatigue will likely contribute to her difficulties. She should be able to maintain
> amicable relationships with coworkers and supervisors, although at times her
> patience is likely to wane and she may display mild irritability. She appears to
> be experiencing considerable distress secondary to her medical issues and
> psychosocial stressors, and she would likely find additional work pressures to
> overwhelm her emotional control and capacity to cope effectively.

R. 216-17. Dr. Gordon reported the plaintiff was cooperative and displayed good motivation.

R. 217. Dr. Gordon concluded :  "There was no evidence of an attempt to embellish her

symptoms or otherwise provide misleading information."  R. 217.

---

[1]    The Global Assessment of Functioning (GAF) Scale is used to report an
individual's overall level of functioning.  Diagnostic and Statistical Manual of Mental
Disorders 30 (4th Edition) ("DSM-IV"). A GAF of 41-50 indicates:  "**Serious symptoms**
(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **or any serious
impairment in social, occupational, or school functioning** (e.g., no friends, unable to
keep a job)."  DSM-IV at 32 (emphasis in original).

The plaintiff was also referred to Dr. Padove by the Social Security Administration for a consultative physical examination on January 28, 2008. Dr. Padove reported that his comprehensive exam of the plaintiff's musculoskeletal system revealed the following: "She had difficulty sitting up, complaining of pain. She also had difficulty taking her shoes and socks off and then complaining of low back pain." R. 206. Dr. Padove's range of motion testing revealed reduced range of motion in the dorsolumbar spine and hips. R. 209. Dr. Padove's diagnoses included fibromyalgia, degenerative disease of the hip, degenerative disc disease, psychosis, and depression. R. 207. Dr. Padove concluded: "I think the patient has significant impairments, which are outlined above." R. 207.

There are also x-rays of the plaintiff's lumbosacral spine from Dr. Romeo, another Social Security consultant. R. 219. The x-ray showed a "stable right SI joint screw fixation," but was otherwise normal. R. 219.

## IV. DISCUSSION

### A.

The plaintiff argues on appeal that the ALJ erred in failing to accord great weight to the opinion of Dr. Foster, her treating physician. Pl.'s Br. 12. Under the regulations, a treating physician's opinion will be given controlling weight if it is well supported and not inconsistent with other substantial evidence in the record.

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

14

20 C.F.R. § 404.1527(c)(2). In considering whether an ALJ has properly rejected a treating physician's opinion, this court is not without guidance. "The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" exists when the evidence does not bolster the treating physician's opinion; a contrary finding is supported by the evidence; or the opinion is conclusory or inconsistent with the treating physician's own medical records. Id. If a treating physician's opinion is rejected, the ALJ must clearly articulate the reasons for doing so. Id.

The ALJ gave little weight to Dr. Foster's opinions, and rejected her PCE and clinical assessment of pain and fatigue forms, which indicated the plaintiff would be unable to work due to debilitating pain and medication side effects. The ALJ found these opinions were not supported by Dr. Foster's "own records, medication or treatment plan." R. 26. The ALJ noted that although "Dr. Foster began seeing the plaintiff in April 2008, she did not diagnose the claimant with fibromyalgia until April 2009." R. 26. The ALJ found that Dr. Foster's failure to refer the plaintiff to a specialist until January 2010 suggested the plaintiff's "symptoms were not severe enough for the referral." R. 26. The ALJ observed that, even though the plaintiff carried a diagnosis of fibromyalgia, Dr. Foster's treatment notes show only one examination, March 17, 2010, wherein she noted the plaintiff had tenderness over joints and trigger points. R. 26. The ALJ remarked that this notation occurred after Dr. Morgan questioned the plaintiff's diagnosis of fibromyalgia. R. 26.

The ALJ also found the medical evidence showed Dr. Foster's opinions were "inconsistent with the claimant's other treating physicians and her own treatment records, which renders her opinions less persuasive." R. 26. The ALJ noted Dr. Morgan encouraged the plaintiff "to increase her social activities, religious activities, and suggested that she begin volunteering her time." R. 26. The ALJ concluded this "suggests the claimant's impairments are not as severe as she has alleged." R. 26.

The ALJ also found Dr. Foster's treatment records contained gaps in treatment, which he found to be "inconsistent with the severe functional limitations and pain alleged by the claimant." R. 27. The ALJ noted several occasions in which the plaintiff did not return for follow-up visits until several months after Dr. Foster had instructed. R. 27.

All of these reasons articulated by the ALJ for refusing to credit Dr. Foster's opinions are supported by substantial evidence in the record. Based on the medical evidence, the ALJ found Dr. Foster's opinions were inconsistent with her own treatment notes, and were not bolstered by evidence from other treating doctors. Therefore, the ALJ had good cause for rejecting Dr. Foster's opinions, and his decision to do so is supported by substantial evidence.

The plaintiff takes issue with two of the ALJ's findings related to Dr. Foster's opinions. The plaintiff argues the ALJ applied the wrong legal standard when he stated that Dr. Foster's examination did not indicate the plaintiff met a Listing. Pl.'s Br. 13. The plaintiff argues this was the wrong standard because Dr. Foster never opined the plaintiff met a Listing. Id. However, the plaintiff does not dispute the ALJ's finding that she does not

16

meet a Listing. While the plaintiff's failure to meet a Listing is not determinative of whether Dr. Foster's opinions are supported by substantial evidence, it is at least some evidence tending to show the plaintiff's condition was not disabling. The ALJ's decision does not suggest he viewed the plaintiff's failure to meet a Listing as a major factor in his decision not to credit Dr. Foster's opinions. Therefore, any error would be harmless because the ALJ gave multiple other reasons supported by substantial evidence for discounting Dr. Foster's opinions.

The plaintiff also contends the ALJ erred by questioning Dr. Foster's motives for completing the PCE and clinical assessment of pain and fatigue forms. Pl.'s Br. 13. The ALJ's discussion of Dr. Foster's opinions includes the following:

> The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

R. 26. The ALJ's discussion of a possible motive behind Dr. Foster's opinion does not mean that his decision was not based upon proper legal standards. In Kelly v. Comm'r of Soc. Sec., the court considered language identical to that used by the ALJ in the present case. 401 F.App'x 403, 404 (11th Cir. 2010) (unpublished). The Kelly court found no merit in Kelly's argument that the ALJ discounted her doctor's opinion because it was rendered because of

sympathy for his patient or to avoid doctor-patient tension. Id. at 407, n. 6. The Kelly court found that the ALJ acknowledged that such motives were difficult to confirm, and ultimately concluded the doctor's opinion "was less persuasive because it lacked evidentiary support and in fact was inconsistent with other evidence." Id. The present case is indistinguishable from Kelly. As discussed above, the ALJ gave multiple other reasons for rejecting Dr. Foster's opinions. Therefore, the plaintiff's argument on this issue fails.

**B.**

The plaintiff also argues the ALJ failed to explain why he did not accept the opinions of the consultative examiners, Drs. Padove and Gordon. Pl.'s Br. 12. As one-time examining physicians, the ALJ had no duty to give special weight to these evaluations. An ALJ is only required to give controlling weight to a treating physician's opinion. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Because the ALJ did not give controlling weight to any of the plaintiff's treating doctors, he was required to consider the following factors in determining how much weight to give the opinions of Drs. Padove and Gordon: (1) whether the doctor has examined the plaintiff; (2) whether the doctor has a treating relationship with the plaintiff; (3) the extent to which the doctor presents medical evidence and explanation supporting his opinion; (4) whether the doctor's opinion is consistent with the record as a whole; and (5) whether the doctor is a specialist. 20 C.F.R. §§ 404.1527(c), 416.927(c).

The opinions of Dr. Padove cited by the plaintiff are his report of abnormalities in range of motion testing, and his conclusion that the plaintiff "has significant impairments

18

which are outlined above."  Pl.'s Br. 12. Contrary to the plaintiff's argument, the ALJ

explained why he gave Dr. Padove's opinions little weight. The ALJ afforded Dr. Padove's

opinions little weight because he found them "generally inconsistent with the medical

evidence as a whole." R. 27. The ALJ also found that Dr. Padove's assessment "assigns too

much significance to the claimant's impairments in light of the other medical evidence of

record, including the lack of objective findings."[2] R. 27. The reasons given by the ALJ for

not crediting the opinions of Dr. Foster apply with equal force to the opinions of Dr. Padove.

The medical evidence of record, including the lack of objective evidence, provides

substantial evidence to support the ALJ's decision to afford Dr. Padove's opinions little

weight.

The ALJ gave the opinions of Dr. Gordon, the Commissioner's psychological

consulting examiner, "some weight."  R. 28. The plaintiff cites Dr. Gordon's assessment of

a GAF score of 50 in arguing the ALJ did not properly reject her opinions. Pl.'s Br. 12. In

giving Dr. Gordon's opinion "some weight," the ALJ adopted the following opinions of Dr.

Gordon:

> Dr. Gordon opined that the claimant's cognitive functioning, memory,
> receptive and expressive language skills were intact, and that the claimant
> should be able to remember, and follow through on work instructions, but that
> her work focus and pace could fall below average at times due to her
> psychological issues. Dr. Gordon also noted that the claimant should be able

---

[2]  It should be noted that Dr. Padove did not have access to any of Dr. Foster's or Dr. Morgan's treatment notes when he examined the plaintiff. Dr. Padove examined the plaintiff on January 28, 2008, which was prior to the earliest treatment notes from those doctors contained in the record.

to maintain amicable relationships with co-workers and supervisors, although her patience may wane.

R. 28. Although the ALJ did not elaborate on his reasons for adopting only portions of Dr. Gordon's findings, his reasoning can be discerned from his consideration of the plaintiff's allegations of limitations due to her depression.

The ALJ found the plaintiff's allegations of disabling symptoms from depression were inconsistent with the medical evidence of record. R. 27. The ALJ extensively discussed the treatment notes from Dr. Jetty, the plaintiff's treating psychiatrist.[3] He observed that Dr. Jetty noted improvement in the plaintiff's depression during her treatment. R. 27. Dr. Jetty also noted that the plaintiff reported improvement in her symptoms with treatment. R. 27. The ALJ noted that the plaintiff reported to Dr. Jetty that "overall she was better" and that "she had kept her godchildren's grandchildren" when she was seen in June 2007. R. 27. He observed that on August 7, 2007, the plaintiff "reported that she was doing okay," and that Dr. Jetty had encouraged her "to apply for jobs and to increase her activities and her social interactions." R. 27. The ALJ noted that when the plaintiff was seen on October 9, 2007, she reported that "she was better and had signed up for vocational rehabilitation." R. 27. He observed that the plaintiff reported in January 2008 that "she was keeping her nine month old granddaughter on weekends." R. 27. The ALJ noted that the plaintiff reported "that she was doing fair, and that she was spending more time with her family, going out and

---

[3] Dr. Gordon did not have access to any of the plaintiff's treatment notes when she examined the plaintiff. R. 214.

shopping" when she saw Dr. Jetty in August 2008. R. 27. The ALJ noted the plaintiff reported on January 8, 2009, that she was taking computer classes and "laughingly stated that she was trying to get some knowledge in her brain." R. 27.

The treatment notes cited by the ALJ show the plaintiff's condition improved with treatment. They provide substantial support for the ALJ's decision to give Dr. Gordon's opinions only "some weight."  Therefore, the ALJ did not err in his evaluation of Dr. Gordon's medical opinions.

## IV. CONCLUSION

The court concludes the ALJ's determination that the plaintiff is not disabled is supported by substantial evidence, and that the ALJ applied the proper legal standards in arriving at this decision. Accordingly, the Commissioner's final decision is due to be **AFFIRMED**. An appropriate order will be entered contemporaneously herewith.

**DONE** and **ORDERED** this 19th day of December, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge